## Case No. 16,877.

### VAN SYCKEL v. The THOMAS EWING.

[Crabbe, 405; 3 Law Rep. 449; 5 Pa. Law J. 231; 3 Pa. Law J. Rep. 301.] [1]

District Court, E. D. Pennsylvania. Nov. 27, 1840. [2]

AFFREIGHTMENT — LOSS OF CARGO — STRANDING — JETTISON — PERILS OF THE SEA.

1. Where a vessel arrived off Mobile towards evening, there being indications of bad weather during the night, and the captain, unable to obtain a pilot, determined to follow a pilot-boat up the bay, and in so doing the vessel ran aground: such grounding cannot be imputed to the fault or misconduct of the captain.

2. A vessel being aground, the captain ordered the deck-load, consisting of casks of brandy, to be thrown overboard: it was found impossible, however, to throw the casks over whole, and their heads were knocked out to allow the liquor to escape through the scuppers. *Held*, that such a state of facts would not sustain a charge of want of skill or of misconduct against the captain; and that the brandy was lost by "peril of the sea."

[Cited in Knox v. The Ninetta, Case No. 7,912.]

This was a libel on a bill of lading. It appeared that, on the 4th March, 1840, the libellant [Elijah Van Syckel] shipped sundry casks of brandy and other liquors on board the Thomas Ewing, John W. Ireland, master, consigned to Ogden & Brother at Mobile, eighty-eight casks being loaded on deck; that on the 4th April, 1840, the schooner arrived at the mouth of Mobile Bay; that the weather was then threatening, and the captain being unable to obtain a pilot, determined to follow a pilot-boat up the bay, the persons on board such boat having told him, on learning his draught of water, that he might do so in safety; that, so going up the bay, the schooner grounded in a very dangerous position; that the captain ordered the deck-load to be thrown overboard, and it being impossible to throw the casks over whole, they were staved; that the vessel then was much easier; that on the next day the captain hired lighters to take the rest of the casks to Mobile, where they were delivered to the consignees on payment of freight and $593.64, the amount of salvage, average, &c. And on this state of the facts the consignor libelled the schooner for his damages.

Mr. Hood, for libellant.

It lies on the respondent to justify the destruction of the cargo. 1 Saund. Pl. & Ev. 330, 331. But the destruction cannot be justified in this case. The Rebecca [Case No. 11,619]; 3 Kent, Comm. (1837) 318; Laws of Wisbury, art. 21, 8; Laws of Oleron, 8 Abb. 378, 379; Marshal, Ins. 466; Poth. Obl. 62; 2 Phil. Ins. 176.

---

[1] [Reported by William H. Crabbe, Esq. 3 Law Rep. 449, contains only a partial report.]

[2] [Affirmed by circuit court. Case unreported.]

G. M. Wharton, for respondent.

The loss in this case happened from a peril of the sea. It is said that the captain should have taken a pilot, and not being able to do so should have waited, but he would have done so in the face of a threatening storm and at the risk of his cargo.

HOPKINSON, District Judge. The libellant in this case complains, that on the 4th of March, 1840, at Philadelphia, under a certain contract or bill of lading, he shipped in good order and condition, on board the schooner Thomas Ewing, whereof John W. Ireland was then master, ten hogsheads of rum, twenty casks of fourth proof brandy, fifty barrels of rum, and one hundred and sixty barrels of first proof brandy, whereof eighty-eight barrels of the first proof brandy were laden on the deck of the said schooner, to be delivered in like good order and condition at the port of Mobile, the dangers of the sea only excepted, unto Ogden and Brother, or their assigns, they paying freight, &c. That on the 6th of April the vessel arrived at Mobile, that the consignees offered to pay the freight according to the stipulations of the bill of lading, that all the goods were delivered except the eighty-eight barrels of brandy laden on the deck of the schooner, which were never delivered, but that the said eighty-eight barrels of brandy were wantonly, illegally, and contrary to the contract aforesaid, stove in on the said deck, and totally destroyed without any sufficient and legal cause, on the 4th and 5th days of April, 1840, during the continuance of the said voyage. It is further stated that by the misconduct and want of skill and attention of the said John W. Ireland, in attempting to proceed up Mobile Bay without a pilot on board, and by other misconduct and neglect of the said John W. Ireland, the said schooner grounded on the west bank of Mobile bar, on the evening of the 4th of April, 1840, by means of which misconduct and neglect the libellant was subjected to pay as salvage and charges incident thereto, on that part of his goods not destroyed by the said John W. Ireland, and shipped in the hold of the schooner, $593.64. The claim of the libellant is for the amount or value of the eighty-eight barrels of brandy destroyed and totally lost, and for the salvage and charges paid by him on that part of his goods which was safely delivered. The answer of the respondent, put in on behalf of the owners of the schooner, alleges that the schooner proceeded on her voyage on the 5th of March last past, and arrived at Mobile on the 6th of April following; that during her voyage, viz.: on the 4th day of the said April, the vessel grounded on the bar of Mobile Bay, owing to the difficulty of the navigation and the state of the weather, and to the impossibility of procuring a pilot for the immediate use of the said schooner, at the same time the master thereof following the advice and direction of the pilot who was aboard one of the vessels in advance of the said schooner. The respondent avers that the said grounding of the schooner arose from and was caused by the dangers of the sea, and not in any degree by the misconduct, want of skill or attention of the said master, or by any neglect on his part; that for the purpose of lightening the vessel, and in order to save her from bilging, she striking very hard, the deck-load was thrown overboard; the heads of some of the casks being stove in; that no part of the cargo but the deck-load was injured; that this was done in order to the general safety and preservation of the vessel and cargo, and conduced to that end. The answer then proceeds to aver that having failed in all the attempts to start the schooner from her position in the mud, certain fishing smacks were employed to unload the cargo and take it to Mobile, and that the vessel being thus lightened was got off and proceeded to Mobile; that the average and salvage paid for this service were adjusted and settled by proceedings in the admiralty court at Mobile, to which the consignees of the brandy of the libellant were parties and assented; and that they received all the goods contained in the bill of lading, except the barrels thrown overboard; that they paid the freight and also their proportion of the average and salvage.

No objection has been taken on the part of the respondent to the jurisdiction of the court, nor to the proceeding in rem against the body of the vessel for compensation for the injury and loss complained of. I shall, therefore, give no opinion upon those points. The questions to be decided are questions of fact, and the issue is so taken in the bill and answer. By the contract, or bill of lading, the respondent undertook and bound himself to deliver the goods therein mentioned at Mobile, in the like good order and condition in which he received them, "the dangers of the sea only excepted." Has he performed this contract? Was the loss complained of caused by dangers of the sea, or were the said eighty-eight barrels of brandy, as the libel alleges, wantonly, illegally, and contrary to the contract aforesaid, stove, broken and destroyed, without any sufficient or legal cause. Witnesses have been examined by both parties upon this issue of fact. On the part of the libellant, George Dudley has testified, that he was a passenger and consignee of part of the goods on board the schooner, that he was on deck when she went aground, about 8 o'clock on the evening of the 3d of April. The captain proposed lightening the cargo; there was a quantity of barrels of brandy on deck. The captain and mate concluded on throwing them overboard. I understand this witness to say that this was after the schooner had been three or four hours aground. They threw the brandy overboard by staving in the heads of the barrels. This was on the west bank of Mobile bar, and about three or four hun-

dred yards from the lighthouse. The wind was not immoderately high when the schooner went aground; there was a considerable surf and breakers; captain was much alarmed when the vessel went aground; he had not any pilot on board. There was only one officer on board. The captain did not, as deponent recollects, consult him as to staving the brandy. There was a more convenient way proposed of getting rid of the brandy, and that was by the means they adopted of staving in the heads. I would here observe that the witness does not state by whom this way of getting rid of the brandy was proposed, and he says they, that is, the captain and mate, adopted it; it would rather seem that the proposition came from others. The witness left the schooner the next morning, the weather being moderate but foggy, and neither vessel nor cargo having suffered, except that part thrown overboard. He says that the place where they went aground is above the place where vessels usually take in pilots. He thinks the wind was blowing on shore when the vessel went aground and the brandy was thrown overboard. There was a pilot-boat, but hardly near enough to speak at the time he went aground. Samuel Smith was not in the vessel, and says nothing as to the accident or causes of the loss. Charles W. Ogden, one of the consignees at Mobile, gives no information as to the accident or cause of the loss, but he says it is customary for vessels bound to Mobile, to take in pilots before they enter the bay: he says without exception. The narrows are formed by Dauphin Island and other land. The bar extends outside, and crossing it is difficult navigation. This is all the testimony on the part of the libellant—and but one of the witnesses, George Dudley, testifies anything upon the question we are now inquiring about, that is, the cause and manner of the loss.

On the part of the respondent, several witnesses have been examined. The first was Joseph Woods, but he only speaks of proceedings at Mobile after the arrival of the vessel there. Erastus Large was on board the schooner on the voyage in question, as a seaman. He testifies, that after a passage of twenty-four days they got sight of the light-house at Mobile point, saw a pilot-boat in the afternoon, made toward her, the boat steered out, spoke a ship, and put a pilot on board of her. The boat then steered for our schooner. We spoke her when we got near enough, and asked for a pilot; they said they had none. Then we could not get a pilot. They said, follow them and they would take us in. As the water looked very bad, like squally and rough weather, it was thought best by the captain and mate to go by their directions, and steer after the boat. This was just before sunset. They steered after the boat by their directions as nigh as we could. Before we got in it came on so dark that they could not see the boat only by a light they put out. About 8 o'clock they struck the bottom; hailed the pilot-boat, but she did not come to them. They lay there on the bar until Sunday morning at 10 o'clock. She thumped pretty hard the first night, after that she did not thump hard for more than once in a while. The witness then details the efforts that were made, by carrying the anchor out, &c., to heave the schooner off, doing all they could until 12 o'clock on Friday night. There was a considerable sea on her, and she thumped pretty heavy. It was thought by the captain, and, he believes, the mate, to throw her deck-load overboard, to keep her from beating to pieces. This lightened the vessel and she did not thump so hard. The next morning they took their clothes and some provisions ashore to the light-house. They had previously hung a signal at half mast. He speaks of the employment of the fishing boats to take part of the cargo out, and get the schooner off. The vessel was considered by the officers to be in a dangerous situation, when they threw the deck-load overboard, and the witness thought so himself. They did not think she would ever get off, when they went to the light-house and tried to get help. On his cross-examination, he says that at the time they saw the pilot boat there was a light wind on the land, the weather looked thick and squally, but there was no squall. The sea was very moderate then. When the brandy was thrown overboard, there was a light breeze towards the shore, and the tide was making out at about five miles an hour. They fired guns after they struck for an hour or two. It was a rifle or musket. Henry Jordan was a seaman on board the schooner. He says, that when they neared the light-house at Mobile, the weather was very thick, looking cloudy, it had the appearance of bad weather, had a fair wind going up the bay, towards the light-house. In the afternoon of Friday saw a pilot boat, hoisted the pilot jack and made towards the boat, she had just put a pilot on board a ship; she hailed us, we asked if they had a pilot on board, they answered "no", we asked if there were any other boats out, they said they believed not, our captain asked if we could follow them in, they asked how much water we drew, the captain told them, they said "yes, keep after the boat," and we did so as near as possible. The witness then speaks of their running aground, of their efforts to get her off, that she began to beat very heavy on the bottom, it was calm but a very heavy surf, found they could do no good by heaving on the anchor. A light breeze came off the shore, hoisted their sails to take advantage of it, the schooner was still beating on the beach further up, was beating on the bottom worse, the captain sent for the witness and another man in the cabin, and asked us what we thought about throwing off the deck-load. Witness told the captain that

he and the mate ought to know best about it, but that I did not think the vessel would stand long whole. We accordingly went on deck, still beating on the bottom worse. A short time after the mate ordered us to throw the deck-load overboard. We accordingly cut the lashings and threw over what lumber was in the road, then we tried to heave overboard a barrel of liquor, just whole as it was, we found we could not do it, and accordingly went to work staving the heads in and cutting the hoops, at last we cleared the deck; the hawser was then easier, at daylight they hoisted signals, fired through the night from a musket, went to the shore in the boat, taking Mr. Dudley, the passenger, employed the fisherman to take out the cargo and get the schooner off. On the cross-examination this witness says, it was ten or a dozen miles below the lighthouse they first saw the pilot boat, the lighthouse was not then in sight that he knows of.

On this evidence we are to decide whether the loss complained of, was caused "by perils of the sea," or was the consequence of unskilfulness, negligence, inattention or fault of the master; whether, in the language of the libel, the goods in question were destroyed contrary to the contract of the bill of lading, wantonly, illegally, and without any sufficient and legal cause. The counsel for the libellant has with great industry collected and cited numerous cases to explain what are properly perils of the sea, and what it was the duty of the captain to do before he proceeded to the extremity of casting part of his cargo overboard. The law upon these points is well settled, and must be conceded to the libellant as he claims it. Our inquiry is of the facts—that is whether the captain did conform himself to that which the law required of him in the circumstances and situation in which he was placed. The libellant has taken two leading exceptions to his conduct and proceedings: 1. His attempting to come up the bay without a pilot. 2. His breaking the barrels of brandy, instead of throwing them overboard, and taking the chance of recovering all or some of them by their floating on shore. Some other objections have been stated, but they are either of little importance or included in those mentioned.

The schooner, Thomas Ewing, had a valuable cargo on board, about $50,000; she had three seamen before the mast, with the captain, mate and cook, to navigate her. She arrived at or near the entrance of Mobile bay on the afternoon of the 3d of April; the distance from Mobile is not accurately ascertained by the witnesses, but I collect from their testimony that it is about forty-five miles. She came to this point in the afternoon, the navigation of the bay was known to be difficult and I should presume, impracticable, without extreme danger, at night, unless under the command of a pilot or some guidance that might be reasonably depended upon. The master of the schooner having a pilot boat in sight, hailed her and endeavored to get a pilot from her. But it appears she had but one on board, and he was engaged for a ship then entering the bay. The master of the schooner being thus disappointed, asked if there were any more pilots out, from which we must suppose that it was his intention to wait for one, if by waiting there was a probability of obtaining one. He was answered in the negative. The question then presents itself, what was it his duty to do in the actual situation in which he was placed, a pilot could not then be had, and there was no prospect of his getting one until the next day. Night was coming on, and although the weather was not bad, nor even then squally, yet the two seamen testify that the appearances were such as to warrant a belief of approaching bad weather. Large says, the water looked very bad, like squally and rough weather. This was just before sunset. H. Jordan says, the weather was very thick, looking cloudy, it had the appearance of bad weather, and the wind was fair for going up the bay, the pilot was going up the bay, and either on the suggestion of the master of the schooner, or of the persons on board the boat, it was determined to follow her up the bay. Was this a wise and judicious determination, such as a prudent and skilful navigator would make, or is the master chargeable with misconduct, want of skill, and inattention to the interests committed to his charge, and his duties as the master of this vessel, in so determining? He had but one other choice, which was to beat out again to sea, for the wind was setting up the bay, and take his chance there for the weather through the night, and until he should be able to procure a pilot, which was altogether uncertain. We must not forget that no person on board the schooner made any objection then to the course adopted by the captain, nor has any witness here said it was injudicious, and the mate expressly approved of it. The persons on board the pilot boat, who may be presumed to have been acquainted with the navigation of the bay, recommended it, and told the master of the schooner to follow them and they would take him in. This was done after the master had informed them of the draught of water of the schooner. It is clearly in evidence that the schooner did follow the pilot boat, steering by the directions they received from her as nigh as they could. The night was dark, at times they could see where the boat was only by their light. If the schooner had taken the other alternative and gone to sea, and any disaster had happened to her, it would have been more difficult to defend the master against the charges of unskilfulness, inattention, or imprudence. It is my opinion that in determining to follow the pilot up the bay, he adopted the most safe and judicious course in his power, under all the circumstances in which he was placed, and, of consequence, any accident or loss

which occurred in the execution of that proceeding, cannot be imputed to the misconduct or fault of the master of the schooner.

This brings us to the second ground of complaint, for it is undeniable that the master was not only bound to the exercise of skill and attention before the accident, but that after it occurred it was incumbent upon him to use the same skill and attention to prevent any loss of the cargo, or to make it as little as possible. About eight o'clock in the evening, the schooner being under full sail, with a fair wind, and following the pilot boat as nearly as they could, ran upon a bar of mud. The pilot boat was immediately hailed, but did not come to their relief. Every effort seems to have been made by carrying out the anchor and heaving upon it, &c., to get her off, but in vain; she lay thumping on this bar heavily, there being a considerable sea and surf running upon her. It was thought, says Large, by the captain and mate necessary to throw her deck-load overboard, to keep her from beating to pieces. It was done; it lightened her, and she did not thump so hard. Jordan also details the efforts made to get the schooner off, which seem to have been all that judgment and skill could devise; she beat, he says, very heavy on the bottom; it was calm, but there was a very heavy surf. The captain sent for the witness and another man into the cabin, and asked us what we thought about throwing off the deck-load. Witness said he did not think the vessel would stand long whole, and the deck-load was thrown overboard. To the necessity of this measure for the safety of the vessel and all the rest of the cargo, we have the opinion of the captain, the mate, and two out of three of the seamen—can we judge of it better than these persons who were present at the scene, and whose vocation enabled them to estimate the danger and the necessity of the remedy? The event justified the proceeding, the vessel was lightened, the thumping became less, and she was finally got off without injury to herself or the rest of the cargo. As to the means of getting rid of the deck-load, can we say it was a wanton and illegal sacrifice of the property, and that the barrels should have been thrown overboard, and not broken up on the deck of the vessel? She was not strongly manned, and some of her crew were necessarily employed in various services. When the order was given to throw the deck-load overboard, it does not seem that the manner of doing it was expressly directed. The men who undertook it. to whom the order was given, began by cutting away the lashings and throwing over the lumber that was in their way. They then tried to heave overboard a barrel of liquor, just whole as it was, but found they could not do it. and then they went to work staving the heads and cutting the hoops. I understand, although it is not expressly said. that the order to throw off the deck-load was given to the two men

that had been consulted in the cabin. We have no direct evidence of the height of the schooner's side from the deck, but I presume it is not unreasonable to suppose it was from two to three feet. A barrel of brandy is no inconsiderable weight, and I can well believe that these men could not throw eighty-eight barrels over the side of the vessel, incommoded as they must have been by the rising and falling of the vessel as she thumped upon the beach. I do not see that the charge of negligence, want of skill. or misconduct can be maintained on this part of the case.

I am of opinion on the whole case, that there was nothing in the immediate destruction and loss of the property of the libellant, nor in the conduct and proceedings of the master of the schooner antecedent to the disaster, which can be imputed to him as a fault, misconduct. or want of skill and attention in the performance of his duty, but that the loss happened by "perils of the sea," within the meaning of the contract contained in the bill of lading. The average and adjustment made at Mobile, although not binding on us, shows that the same view was taken of the case both by the court of admiralty and the consignees of the the libellant, who were parties to and acquiesced in that adjustment and settlement. Let the libel be dismissed with costs.

On the 4th December, 1840, an appeal from this decree was taken to the circuit court of the United States for the Third circuit, and on the 28th October, 1841. the decree of the district court was affirmed with costs. · [Vide The Juniata Patton [Case No. 7,584]; The Rocket [Id. 11,975].[3]